Our next case this morning is Varlen Corporation v. Liberty Mutual Insurance Company. Ms. Wheeler. Good morning, Your Honors. May it please the Court, my name is Katherine Wheeler. I represent Varlen Corporation in this matter. We're asking that the Court reverse the District Court's ruling in favor of the Defendant Liberty Mutual. The District Court erred in two ways. First, it should have granted summary judgment for Varlen because the pollution exclusion provision that's at issue in the insurance policy here does not apply based on these facts. The fundamental facts are undisputed. The environmental contamination at issue at both sites resulted from sudden and accidental releases. Because those releases were sudden and accidental, the policy exclusion is not triggered. In fact, this falls into the exception to the policy exclusion. Second, the District Court abused its discretion in barring the opinions of Varlen's geology and environmental expert, Dan Rogers. Mr. Rogers' opinions that the contamination at the Lassie and Silvis sites resulted from sudden and accidental releases satisfy the requirements of Daubert. They are reliable and they are relevant to the matters at issue before this Court. What methodology did Mr. Rogers use in reaching his opinions? So Mr. Rogers' methodology depends, and I want to answer the question so if the Court will just bear with me for a moment. It depends on two separate factors that Mr. Rogers was looking at. The first is he was studying the scientific reports that were developed over a period of time at Lassie through different investigations. So groundwater contamination levels, hydrology experts, that's where we talk about the plume, the size of the amount of contamination that was in the groundwater. Mr. Rogers followed up with his experience and evaluated what are the possible causes that could explain the results of that scientific testing. So it's a two-piece process. First you look at that scientific information, then Mr. Rogers uses his expertise as a geologist to explain exactly what the sources were. And Lassie is a situation where Mr. Rogers could determine that there were two possible ways that the contamination identified could have gotten into the ground. We're talking about contamination that flowed through a concrete trench to a sump and eventually into a storage tank. Mr. Rogers explained the contamination in the ground could have come from migration of those chemicals through the concrete, in which case the testing results would have looked a certain way. You would have had consistent levels of contamination that flows vertically and horizontally. That's the migration pattern that Mr. Rogers is describing. And in that situation you would have a certain amount of total contamination. That would be the plume. The second alternative Mr. Rogers described are the sudden and accidental releases that would come from the sump. In this particular situation, after reviewing exactly what the scientific data presented, Mr. Rogers explained the location of that contamination was not near the trench. The location of the contamination was near the sump. About 99% of it I believe he described. In addition to that, he described the vertical and horizontal levels of contamination. There were slugs of contamination. Slugs are higher concentrations in smaller spots. You've talked about the data that he looked at and his ultimate conclusions, but how did he connect the dots to get there? Because that's what the district court found, and where did you identify that for the district court? I agree, Judge. That is what the district court struggled with. It becomes essentially a differential diagnosis akin to what a physician would do. If you're observing someone has a particular set of symptoms. But in differential diagnosis that physicians do, they rule out other causes. Where did Mr. Rogers rule out other causes? That was whether the contamination at issue could have been caused by migration through the trench. That's what he ruled out. The only other potential source of contamination, Mr. Rogers explained, was from the sump and from the sump leaking. That's the connection that I think the district court missed. Because there were only two possible explanations for the contamination as it existed at the site. It was an A or a B. A would be migration through the trench. B would be through accidental releases at the sump. And what is that based on, that there are only two possible causes? Because there is nothing else in the record and there is nothing else in the data that would explain a possible source of that contamination. I realize the district court described it as a mystery. How do we solve this mystery of where this contamination came from? That's what Mr. Rogers was trying to explain. There are only two possible ways that contamination could have gotten to this site. It either could have come from, again, migration through the trench or from releases at the sump. There's nothing in the data that suggests, for example, if the sump were leaking somehow. If there were some sort of migration through the sump or a slow and gradual leak through the sump. The data would not look the way that it did. That's what Mr. Rogers was explaining through words like slugs, which are the higher levels of contamination. And through that discussion of vertical and horizontal migration patterns. He's also explaining that through the quantity of material that you see in the plume. The plume establishes that there was a significant level of contamination that had to come at a particular time because of the size of the plume, the way the plume is structured. Those factors together rule out the possibility of migration from the trench or even, for example, something that wasn't discussed. Like some sort of a leak at the sump, a small leak. That's why Mr. Rogers honed in on this concept of sudden and accidental releases that must have happened because of a sump overflow. And in fact, the facts bear that out. The testimony of record established that at the Lassie site, the sump did fail. And they had to completely remove the sump and replace it during the 1970s. So there is factual evidence that supports the conclusions. The sump failed one time. I think there was evidence of that. That's correct, Judge. Although it's a little unclear from the testimony whether that one failure was sort of the culmination of multiple smaller failures. And the sump had been sort of like if a furnace is failing, sometimes it kicks on, sometimes it doesn't. It's not clear from the record whether it was that situation. Or if it was simply one failure of the sump. But either way, what that establishes is still sudden and accidental releases, which would still fall within the exception to the exclusion of the policy. Let's assume the district court correctly applied Daubert and excluded Mr. Rogers' opinions. How is it that you're still entitled to summary judgment when you didn't argue below that sudden and accidental could be established outside of Mr. Rogers' opinions? It still has to be through the scientific data. The scientific data that exists in the record, regardless of Mr. Rogers' explanation of what that data means, you can still look at that data and extrapolate there was a release here. How can the district court do that without an expert opinion? Because the facts are, when we're talking about sudden and accidental, that's when we think about what is the meaning of those terms, which do have very specific and somewhat counterintuitive meaning. For example, when you look at the Illinois Supreme Court's decision in Alcord Marine, and the Illinois Supreme Court evaluates what exactly does sudden mean. Sudden, according to the Illinois Supreme Court, means unexpected and unintentional. That's what the data establishes here. There's nothing in the facts that are of record. But how can a layperson make that determination without an expert of some type explaining it? There's no evidence of any intentional release. For example, there's no evidence, testimony of malfeasance. But intentional, that's separate. You're asking the district court to grant summary judgment in your favor on a technical term, just based on facts, without any expert guidance. And that's this concept of sudden and accidental being the same as unexpected and unintentional. There is nothing in the record that suggests that these were intentional releases, that they were expected releases. And again, we come back to the testimony about the sum and the failure of the sum. If this were expected and intentional, there would have been no attempt at replacing the sum. The court can extrapolate those conclusions from the facts of record. That assumes that Illinois law applies. That's correct, Your Honor. Although, in the event that this court were to determine that New York would apply, the sudden and accidental language used by the New York courts is very similar. You're talking about certainly there needs to be a temporal connection to establish sudden. But accidental does stand for the same proposition. I see that I'm almost out of time. If I could remain for the rebuttal. Thank you, Your Honor. Mr. Schultz. May it please the court, counsel. My name is Jason Schultz. I'll be presenting argument this afternoon on behalf of Liberty Mutual Insurance Company. Before I launch into my prepared remarks, I think there's a couple of mistakes or misstatements that I think we may have just heard, and so I want to make sure that I correct them in response to your questions. First, there was a suggestion, I think, from counsel that the sum was removed in the 1970s, and that's an incorrect statement based on this record. The sump that we're talking about is the sump at the Lassie site. It's a concrete sump. It is just, I think, because it's an important factual point. The sump is a concrete sump. It's essentially a concrete box. It's three to four feet underneath the ground. It's completely packed in earth. There's a black top on top of this sump. At the very top of the sump, this is all in the record, and this is undisputed. At the very top of the sump, there is a motor, and you can access the motor without breaking into the black top. There has been some testimony from one witness in this case that at one point in the 1970s, and there's a little bit of question whether he actually witnessed this or he was told this, but regardless, there is some testimony that at one point in the 1970s, the pump didn't seem to be working properly. What's supposed to happen is there's operations going on that involve chromium and water, and so there's runoff. It goes into a trench, and it goes down by gravity, the three or four feet, into this sump that is underground, completely packed in earth, packed in soil. Once the level reaches a certain point, the pump's supposed to kick on, and it's supposed to go to another holding tank, and then the whole process resumed itself. It was original to the facility in 1963, and it was removed only for the very first time in 1984 or 1985. What happened in the 1970s was Mr. Davies recalled that at some point, the pump wasn't properly working. What they had to do was open up the black top, not the black top, the lid on it, and replace the pump, and then it worked again. So the suggestion that this is somehow some indication that there was an accidental release is actually not reflected in the record, and the suggestion that they wouldn't have had to fix this  On later questioning, Mr. Davies admitted he didn't know what was going on underneath that earth, and just the operation of the sump indicates that there's really nowhere for the water to go except for to slowly leach or slowly disperse out of the sump itself. So that's the first point I would like to make. The second point I would like to make is the idea that there's something, that there's really only two choices here, and that Mr. Rogers had a differential diagnosis, and that what he did was he ruled out that the chromium wastewater was leaching out of the trench, and so that means there's only one other conclusion that can be drawn from these facts, and that there were sudden and accidental releases out of this concrete box, which is packed in earth. Of course, there's other conclusions that one could reach, and one could logically reach that there's... We can all come up with a bunch of different conclusions of what actually was going on inside that. To address another question that Judge Saini had, the issue of... What happens if Mr. Rogers' opinions are thrown out? What happens then? And there was a reference to there being some scientific data that is in the record setting aside Mr. Rogers' opinions, and frankly, there is no scientific data, and I would refer the court to pages 16 and 17 of Appellant's brief, where there's two paragraphs that talk about what sort of evidence there is in this particular record that reflect what evidence there is of accidental releases, and there's no scientific data there. What there is is what I just described to you, Mr. Davies' testimony, which is not scientific data. It's anecdotal evidence that has a very shaky, at best, foundation for really anything. Even if there is scientific data in the record, is the question of sudden and accidental something that the court can decide based on lay testimony as opposed to expert? Well, I think if there was a recollection of somebody seeing something, I think that would be true, but we certainly don't have anything like that here. A catastrophic event of some sort. Yes, if you had a videotape of something spilling out, that would suggest that you would have evidence of a sudden and accidental event, but what I think is critical here, and I think probably why we're in the position that we're in this position, is these are liability policies. They have pollution exclusions. There's no question that this is pollution that we're dealing with, so we have an exception to an exclusion for sudden and accidental events, and there's no question that the burden as to who has to establish a sudden and accidental event is the policyholder, in this case Varla. So, faced with a record that there's absolutely no evidence whatsoever of any actual sudden and accidental event that took place at either of these two facilities, one in Illinois, one in Los Angeles, one that's strictly just tied to this concrete box that's packed in earth, and the other one which is diesel refueling of locomotives and chlorinated solvents that are used in degreasing operations, aside from the testimony that I just described by Mr. Davies, there's absolutely no anecdotal evidence. There's no photographs. There's no memos. There's no incident reports from operators who said, hey, we saw that somebody was filling something over here, and we've got to reprimand him because he shouldn't be doing that, or we're losing all sorts of critical resources because we don't have them and we don't know what's going on. There's nothing in the record of any of that, and so faced with a record like that, Varlin turned to its head of environmental affairs who submitted the particular report that we're dealing with. And one thing I'd like to point out about the district court, and of course it's abuse of discretion standard, and the court will evaluate whether or not Judge Gottschall abused her discretion here. Judge Gottschall's record that she was faced with, and I think the earlier question about whether or not Judge Gottschall was directed to any evidence of a reliable methodology that was employed here by Mr. Rogers, and the answer to that is no. Judge Gottschall put in her opinion, and you can see it expressly stated, that I was directed to a 161-page deposition transcript, a thousand pages of exhibits, and told essentially go find where my reliable methodology is. Judge Gottschall, on that basis alone, she would not have abused her discretion had she concluded that I'm going to exclude these opinions, because it's not my job as a district court, it's not incumbent upon me, and we've heard this already this morning a couple times, it's not incumbent upon me to go into this record and try to make your arguments for you. But having said that, Judge Gottschall did. She reviewed certainly the 161-page transcript. I will tell you as a litigant in this case that she cited portions of the deposition testimony that neither side had cited to for any reason, clearly evidencing that she went through and did a tremendous job of reading the entire deposition transcript, taking a look at the exhibits, and determining that there was no reliable methodology upon which Mr. Rogers relied. Do we have to decide the choice of law issue before addressing the expert decision, the exclusion of the expert? No, you don't, because the expert would provide them with a relief that they're trying to seek to get out of the situation that we're in currently. What the district court did was say that looking at choice of law, all you need to do is determine whether or not they have the burden under both Illinois law and New York law to establish a sudden and accidental release. Right, but do we need to know what the meaning of that term, sudden and accidental release is, to determine whether the expert's opinion on that subject was properly excluded? No, you do not. Because under New York law, sudden has a certain meaning that maybe it doesn't have under Illinois law. Accidental has the same meaning under both states. And the only evidence in this case, certainly of sudden, is from the opinions, and accidental is also from the opinions. Again, I refer you to the reference to the fact that you can look outside of that to accidental. That's the pages that I referred you to before, and there's no real evidence there. There's a suggestion that there's some sort of data. There is no data. There's this anecdotal evidence from the former worker who was standing on top of the blacktop, which is not evidence of any accidental release under either state's law. So, yeah, absent the expert report, what you're saying is that there's no affirmative evidence to satisfy that definition, no matter whether you're applying New York or Illinois law. Absolutely. So we really don't even have to reach that question. Correct. And I think the only question you might have to reach is if the burdens were different under different states, because then it might swing and it might make a difference. But as the District Court correctly noted, and I think the footnote of the opinion, there's no difference there. And I think ultimately, and I think the questions went to the heart of this, it's sort of how do you get from A to B. Certainly there was some data that was relied on here. We're talking about this plume diagram and the vertical migration and those sorts of questions. That's the data. That's the basis, and the court said there was a basis. But there's no way to get from point A to point B without applying reliable methodology, and there is none here. So on that basis, we would ask that you affirm the District Court's exclusion of the opinion and affirm the District Court's grant of summary judgment in favor of liberty and mutual. Thank you. I'd like to start with a question that you just asked Judge Sykes about whether we would have to resolve a choice of law question before we can even really fully analyze whether or not the District Court's decision about the admissibility of the expert opinion was correctly decided. And I think that's correct, and it's correct because of this very specific term, as I mentioned before, that the Illinois Supreme Court has utilized as to the meaning of sudden. And if this court concludes that a choice of law analysis is required, then it seems that the most effective way to handle that issue would be to remand this case to the District Court for an evaluation of two things. One, the choice of law issue with additional briefing, and two, to evaluate whether or not within the context of that decision on choice of law it's appropriate to admit those opinions were not. Choice of law is a legal issue that we can resolve, and it's been fully briefed here. It has been, and certainly this court could do that. But the distinction that I would suggest to the court is that the District Court would have the ability to make that decision based on the entirety of the record. I understand that it is a legal determination, but it is still colored by the facts in this case. If there are no further questions, we ask that this court reverse. Thank you. Our thanks to both counsel. The case is taken under advisement.